Okay, the next case on this morning's docket is People of the State of Illinois v. Dorian Boyd. Mr. O'Neill. May it please the Court, Counselors. My name is Lawrence O'Neill, and I represent Dorian Boyd in this matter. This is a direct appeal following Mr. Boyd's conviction of first-degree murder by a jury following the late-night shooting death of Dion Harden outside of a club in St. Clair County. With respect to Argument 1 in the brief, a key part of the State's case was the admission and publication of video recordings and photographs as substantive evidence produced by the club's surveillance cameras that showed a subject apparently shoot Harden outside the club. Mr. Boyd challenges the admissibility of the surveillance videos and the two photographs that were made from the surveillance videos as substantive evidence because the State failed to lay a proper foundation to establish that the recordings were accurate and reliable representations of what they purported to depict. Mr. O'Neill, I'm interested in your use of the word substantive evidence. Why do you believe it was substantive? It was played and published for the jury, and the prosecutor argued in closing argument regarding the substantive evidence involved with the use of videotapes. How would you distinguish substantive versus demonstrative? Demonstrative would be an aid to describe, to aid a witness describe some fact consistent with their testimony. This was used to stand on its own as proof that, substantive proof that Mr. Boyd was the shooter of Dion Harden in this case. Does it actually show him shooting the victim? It shows a person come out of a crowd and appear to strike and then you see like a flash. The shooter was very close in proximity to the deceit and shows a flash go off. So the argument is by the State that that was the shooting. That was the event that caused the shooting. But the video actually is taken from inside the club, right? There's one from outside too. There's one from outside the club. And there were witnesses who testified as to what was going on in the video, correct? There was, well that's the problem. There was no witness with personal knowledge of the shooting who witnessed the shooting testify that that recording accurately represents what they saw. That's how it would be, that's how the recordings would be admissible normally, generally speaking, when someone has personal knowledge of the events. They can testify then that their recording accurately reflects what they saw. Now you may be referring to Christopher Adams who testified that he watched the video, watched the surveillance video at the prosecutor's office. And Adams testified that he saw the shooting, he was an eyewitness to the shooting, he testified. And then in response to the prosecutor's question, he said yes, that video represents what I saw. That was in the prosecutor's office. Christopher Adams did not identify the State's exhibits that were played at trial as accurate representations of what he saw. So in order to establish a foundation based upon a witness's personal knowledge of the events, Adams would have had to testify that the video, yes, people's exhibit 7A, that accurately reflects what I saw. That was not, that was not. So you're saying there was no testimony by Adams as to the video at trial? Correct, Your Honor, correct. And there was no other witness who. And that was the video that was outside? He didn't, well, maybe, perhaps. I mean, he didn't testify in great detail about what video he saw at the prosecutor's, what he viewed at the prosecutor's office. But the club owners testified as to the video from the inside. But again, Your Honor, they did not have personal knowledge of the shooting. They were not witnesses to the shooting, the club owners. They were not witnesses to the shooting. Now that relates to my second argument where the court allowed the Garretts, the owners of the club, and another officer, Ron Schaffer, to identify Mr. Boyd as the shooter. But they were not identifying him based upon personal knowledge of seeing the events. They were testifying, offering lay opinion testimony that, yes, I know Mr. Boyd, that's him. Yes, he's the one who comes out of that crime. He's the one who has that gun in his hand. That's what Officer Ron Schaffer testified to and Andrea Garrett did, which was extremely prejudicial lay opinion testimony, not based upon their own witnessing of the events. So what is your argument that is the difference in foundation between substantive videos, videos that are used for substantive evidence, versus pictures or photographs or videos that are used for demonstrative evidence? Demonstrative evidence would be a witness while the tape is playing. Yes, this is what I saw. See this? This is where Boyd comes out of the crowd and shoots him. It was more like a demonstrative aid to his testimony. This was not how these videotapes would play. You think the burden is higher on substantive evidence? Absolutely, Your Honor. Absolutely. Because it stands on its own as evidence, as substantive evidence. And the prosecutor referred to the videos, particularly regarding the Garretts and Officer Schaffer's identification of Mr. Boyd on the videos, as substantive evidence. If you read the closing argument by the prosecutor, he says when he's making the case that that was Mr. Boyd who shot Howard. We have the Garretts who testified that that was him from that video. You have Officer Schaffer who was testifying that that was Boyd from that video. So it was used in a substantive manner to prove that Mr. Boyd was the shooter. So getting back to the foundation for this, since there was no witness who testified that these video recordings represent what I saw, the videotapes were admitted under what's the silent witness theory, which is used, recordings can be admitted under the silent witness theory to admit a visual recording where no witness with personal knowledge of the scene can authenticate the recording. That's what we have the case here. Under the silent witness theory, a witness need not testify to the accuracy of the visual recordings if the reliability of the process that produced the recordings is established with a proper foundation by the state. And the burden is on the state to establish this proper foundation for the admission of visual recordings under the silent witness theory. The majority of these silent witness cases involve surveillance cameras, and that's what we have here. Now, courts have recognized the risks and dangers of possible inaccurate recordings and the manipulation, fabrication, and modification of these recordings, that it's especially acute in this age with the shift to digital visual recordings and the prevalence of sophisticated technology, and it put a burden on the state to establish that the recording process that produced the recording are accurate and reliable representations. A complete and proper foundation is critically important because there is no way a jury viewing video recordings at trial can determine whether the recordings are accurate or whether any variations have been made to the recording. Therefore, in 2011, the Supreme Court in People v. Taylor addressed the admissibility of surveillance recordings under the silent witness theory and held that visual recordings under this theory may be admissible where the state establishes certain foundational requirements. And in this case, the state did lay a proper foundation regarding the proper chain of custody and copying process, but there was no evidence regarding the process that produced the recording when the officers first viewed it after the shooting and then copied it and preserved it with proper chain of custody. So that's the important point. There was insufficient evidence to establish the reliability of these videos prior to the time the officers viewed it. What does that mean? Now, what should have been done then? There should have been evidence regarding the installation of the system. But no, I thought that Garrett and the husband and wife did provide some of that. Well, they did testify, Your Honor, that the system was installed four years prior to the shooting when they had the building refurbished, and it was a construction company named Blackburn Construction Company. But there was no evidence about the individual from Blackburn who installed it, nothing about his competency or knowledge of these matters, nothing about who loaded the camera, who activated the system. There was no evidence about whether the system was properly tested and maintained, who the operator of the system was during this four-year period. There was no evidence that the system had produced reliable representations in the past. But the law in Illinois doesn't expect you to go to all that effort. If a police officer can look at the video later and identify who's in the video, he recognizes the person from the video based upon prior arrests. But, Your Honor, the officer is just viewing the video after it has been produced. And it's been held admissible for foundation. Well, there are several cases that have found that the foundation is proper, where the state establishes the installation process. I understand that. Yes, Your Honor. I have another question, though. Wasn't there one of the witnesses, Adams, that verified that that's actually what he saw was on the video? Well, Your Honor, again, he did not identify the state's exhibits that were admitted at trial about that video. He testified that he watched the video in the prosecutor's office, and that represented what he saw. But that's not a sufficient foundation for establishing the reliability to produce the video that he saw in the prosecutor's office, or that it authenticated those videos for purposes of admitting them as substantive evidence. So it's your position that you have to go out and get the company that installed the video, and they have to provide testimony as to how they did it and how reliable it is? Yes, and that it was tested, and that it produced... Tested when? Like the day of? Well, there was no testimony about any testimony. Some testimony that it was tested, and most importantly, that it produced reliable images in the past, and that it was in good working order. Otherwise, again, like I said, all you do, Mary, is going to get a police officer who looks at it after the videotape has been made. After the recording process is completed, the officer can't determine whether the system, the process that produced what he's viewing was producing accurate, reliable images, and that it was not manipulated or modified in some way. Thank you. Thank you, Your Honors. Your Honors, counsel, the exhibits, the videotapes, the pictures, the stills taken from the videotapes, were admitted under the silent witness theory, and they were admitted substantively. This is not demonstrative evidence. Couldn't say otherwise. If you invest the silent witness rule, then you have to meet all of the requirements. Yes, exactly, and the state did. And so it's your position you're invoking the silent witness rule? That is the theory under which the court admitted this evidence below, and so that is how it was accepted. It was received as substantive evidence, and, yes, the people had the burden to meet the foundational requirements. And did so. Just as an overview, I want to give you a clarification of what evidence you're looking at. People's Exhibit 1 and 2 are cameras 1 and 2. People's Exhibit 1 shows the outside camera, and it shows the murder from the outside. People's Exhibit 2 is a camera that was inside, and it shows from the inside out. People's Exhibit 7 and 8 are slowed down versions of 1 and 2. They are recorded at a slower speed with some footage that was extraneous omitted. And who testified as to how those exhibits were made, 7 and 8? Workman and Peterson were responsible for this. So let's go back. When Taylor sets out the foundational requirements, they're not exhaustive. Some may be applicable in any given case and others won't be applicable in other cases. The bottom line is that the video material must be shown to be reliable and accurate. And in some cases, like the competency of the operator in this particular case, would not be applicable because this was an automated system. Does the court say that an automated system excuses production? No, I'm just saying that at one time, no, no. The overarching and dispositive issue is the state, as a foundation, must show that the video is reliable and accurate. And some of the factors the court may consider are set out, and that could include the competency of the operator if there's an operator. There's no operator in this case. And so I'm just saying that that particular factor is inapplicable in this case because each case is different. The defense relied on a case called People v. Smith. Are you familiar with that case that was cited by them? I don't mean to put you on the hook. I'm sorry. I remember Sykes, but I don't recall Smith. They relied on People v. Smith, which was an audio-video recording. And in that case, Justice Sheila O'Brien indicated that a sufficient foundation had been laid for a motion picture when the witness testifies that the film is an accurate portrayal of what it intends to show. And the police officers identified the individual from the videotape, and it was used as substantive evidence, and no silent witness rule was invoked. And that was cited by the defendant. So I'm curious as to why you think you need to, and I'll accept the fact that you want to invoke the silent witness rule, but it doesn't seem necessary all the time. I would say that this court should follow Taylor, which is an Illinois Supreme Court case, and that those factors that are applicable should be looked at. But as Taylor indicates, what we're looking at is reliability and accuracy. And what we have here is a system, a DVR system that records on an instrument that's similar to a computer hard drive. It had seven cameras, seven inputs. It was kept in a locked closet to which only Andrea Garrett had the key. And on the night of the murder, there were several officers that arrived, and she unlocked it, and they looked at the monitor attached to the recorder that showed the cameras, the various cameras. She was present. Her husband, Madison, was present. Officer Melvin, Officer Schaefer, Chief Marion were present. They looked at it first. Later on, Agent Workman and Agent Peterson arrived, and they recorded. Now, they explained that all of these persons testified that what was shown on People's Exhibit 1 and 2 and 7 and 8 is identical to what they viewed on the hard drive and on the monitor that night and that it had not been altered. And they also established the chain of custody of how this was kept and how the hard drive was kept. They explained how the copies were made on fresh, newly opened 8-millimeter cassettes and that People's Exhibit 1 and 2 were downloaded on a portable recorder that night in the closet and that these things were unaltered except, as explained, that certain extraneous irrelevant sections were excluded from 7 and 8, which were the slowed-down versions. And they explained Agent Workman was certified by the National Association of Technical Investigators, and he explained that the system was operating correctly and that it produced clear images. So, I mean, these are all foundational requirements that the people met. They also were required to provide identifications of the persons, locale, and subjects and objects that are shown on the video. And there was the Garretts, Andrea and Madison. They knew the defendant, had known him for 20 years, lived across the street from him. They'd known him from a child. They knew his gait and his appearance and his mannerisms. And Andrea had seen him earlier that night and saw how he was dressed and how he appeared that night. So they identified the defendant. They identified the victim. They identified the camera and they identified the entrance. They identified the locale. That was necessary to the foundation. Also, Officer Schaefer had knowledge of the defendant as well, had known him for four years. Did not say that he knew him in a criminal context. He just said he'd seen him and he was familiar with him. That can't have been prejudicial, particularly in light of the fact that there were many other witnesses who testified. Now, Christopher Adams, who was the witness to the murder itself, he testified that he had seen the videotape. And I'm assuming he meant People's Exhibit 1 because he said, and this is a quote, he just replayed it all over again for him. And he testified that it was an accurate representation of what he saw that night. Did he view that particular videotape in court? No, but he viewed a videotape that all the other witnesses involved in the chain in custody and the production of that videotape testified was exactly identical to the one that they viewed that night in the closet where the DVR was kept. So we have a witness to the event who also authenticates the videotape of the event and that it just played it over again. So as to, you know, the manner in which the recording was preserved, People's Exhibit 1 and 2 was made that night in the closet on a fresh 8mm film. And it was, as Workman and Peterson testified, it was to preserve the evidence as it was at the scene right there. They seized the DVR recording machine and took it to police headquarters, to state police headquarters, and it was kept under a complete chain of custody after that that is testified to. Unless there are any questions, I'll ask you to continue. Your Honor, regarding the question about the Smith case, Smith predated Taylor. And he cited a general proposition in the court looking at factors that determine whether a recording is reliable. One of the factors that was looked at was whether there's been things about the installer and whether it was properly operated. But Taylor is the case that controls this silent witness case where the court clearly admitted these videotapes and photographs under the silent witness theory because there was insufficient, there was no evidence. Christopher Adams' testimony does not provide sufficient personal knowledge of the event to admit this tape under the personal knowledge that this scene represented what he saw. He did not identify the state's exhibits in any regard. The state focuses primarily on what the video looked like after the recording was made. And then it says that the foundation was properly established regarding the copying and the preservation of the evidence. And the witnesses did testify regarding the persons and locations of the videotape. However, the evidence did not, there was no evidence about how the system was working prior to the police officers viewing that. Now when Taylor held that we accept the silent witness theory for the admission of surveillance camera video as a trial, the state must establish the reliability of the process that produced the video. So that has to be involved, that does involve what means were taken, whether the state proved, again the state has the burden to prove all this, the state has to prove that what the police officers finally viewed was accurate and not modified. To do that, the state has to establish that the system was working properly before the police officers viewed the surveillance camera at the scene, made copies and preserved them. The only way you can establish that the system was reliable and producing accurate representations is by witnesses saying yes, that system was installed properly, it was tested, it was operated by a competent operator, and that it had produced reliable representations in the past and that it was in good working order. We have none of that here. That burden is very high for a nightclub in Brooklyn, Illinois, who's not going to have service technicians out there every other day. I see the burden in a speed camera that a police officer is running radar. Do you honestly think a club in Brooklyn is going to call somebody out every day to make sure it's operating properly? Not every day, Your Honor. How many days? This is a four year period. How many days? I can't say that, Your Honor. It seems like the argument you make is that if they haven't had them out there within so many hours or so many days, then you're never going to be able to prove a liability. That's not true. Isn't it true that it is inherent proof of liability if somebody can come in and say, here's what I saw happen. That is an accurate portrayal. Is that in and of itself proof that it was working? Your Honor, no witness testified that that was an accurate portrayal. I'm just asking generally. Generally speaking, that would not come in under the sign of a witness there. That would come under the witness's personal knowledge. Good. Now, Your Honor, we need to resist the temptation to accept as a proper foundation the mere fact that a tape exists. If the courts open up the floodgate to that, then there's no... No, I'm not saying that it merely exists, but what it portrays. You can't be certain that what it's portraying is accurate and reliable. It had not been modified or altered in some way unless you established that the system that produced it was in good working order and working properly and had produced reliable representations in the past. We're just jumping to the fact that it exists and that it was copied and preserved. The State has the burden of establishing that what was viewed on the camera was the result of a system and a process that produces reliable images. Well, I thought the owners did offer some basis for that. Well, they testified that a Blackburn construction company installed the surveillance camera system when they refurbished the building. Didn't they look at these videos? The one where he's going out the door with his chicken plate? Who, Your Honor? The owners. Yes, they did. They acknowledged that that film was accurate. But they did not testify that what they saw on those videos was accurate of what actually occurred. But Adams did. I mean, I'm looking right at his testimony. He said, seen it, just replayed it all over again. He testified that the picture is fairly and accurately depicted, how the defendant would have looked in 2009. It was a fair and accurate depiction of what happened that night, which he witnessed with his own eyes. We're not supposed to consider that at all. Not at all. Not for the admission of the video. The reliability of the camera. He was not subject to cross-examination about that. He did not testify in court that I viewed this video as being played. The video that he saw in the prosecutor's office may be different from the videos that were played at trial. He did not identify those exhibits at trial and say that they accurately represent what he saw. One last question. Was he cross-examined on it? Pardon me? Was he cross-examined on that issue that you just read? I can't recall. Okay. Thank you so much. Thank you, Your Honor. Okay, we'll take that case under advisement.